**THIS DISPOSITION
IS CITABLE AS PRECEDENT
OF THE T.T.A.B.**

**UNITED STATES PATENT AND TRADEMARK OFFICE**
**Trademark Trial and Appeal Board**
**P.O. Box 1451**
**Alexandria, VA 22313-1451**

Lykos

Mailed: September 13, 2006

Opposition No. 91169211

Michael J. McDermott

v.

San Francisco Women's
Motorcycle Contingent

Before Seeherman, Holtzman, and Walsh, Administrative Trademark Judges.

By the Board:

San Francisco Women's Motorcyle Contingent ("applicant") has applied to register the mark DYKES ON BIKES for "[e]ducation and [e]ntertainment [s]ervices in the nature of organizing, conducting, and promoting parade contingents, community festivals, events, street fairs, forums, seminars, parties and rallies to support, organize and motivate women motorcyclists everywhere to do the same, thereby fostering pride in a wide variety of sexual orientations and identities, namely lesbian, bisexual and transgender" in International Class 41.[1]  Michael J.

---

[1] Application Serial No. 78281746, filed July 31, 2003, alleging 1976 as the date of first use anywhere and in commerce.

McDermott ("opposer"),[2] an individual residing in San Francisco, California, has opposed registration of applicant's mark.  The notice of opposition includes the following relevant allegations:

> I herewith state my opposition to the United States Patent and Trademark Office (USPTO) granting Any Trademark or other form of Government Approval or Endorsement to the Organization known as "Dykes on Bikes"; the Political Term "Dykes"; or Any Other Group or Activity Associated with the Annual Illegal San Francisco Dyke Hate Riot; or the Criminal and Civil Rights Violations attendant to this Anti Male Hate Riot and March cited by "Dykes on Bikes" in its application.
> Statement of Harm:

> I am a Male Citizen of the United States and a fourth generation native son of the City of San Francisco.  As such, during the annual illegal government supported San Francisco Dyke Hate Riot; I and ALL other Male Citizens are subject to Criminal Attack and Civil Rights Violations committed by "Dykes" taking part in this Anti Male Hate Riot, including attacks often led or inspired by members of "Dykes on Bikes"....

> ..[M]y opposition falls in to[sic] two broad categories, reflecting the dual nature of the Harm from pandering to such "Dykes", whether on motorcycles or not.

---

[2] We note that opposer has chosen to appear *pro se* before the Board.  While Patent and Trademark Rule 10.14 permits any person to represent himself, it is generally advisable for a person who is not acquainted with the technicalities of the procedural and substantive law involved in an opposition proceeding to secure the services of an attorney who is familiar with such matters. The Patent and Trademark Office cannot aid in the selection of an attorney.  *Pro se* litigants are urged to review the Trademark Rules of Practice and the Trademark Manual of Board Procedure ("TBMP") which are available on the Internet at http://www.uspto.gov.  Strict compliance with the Trademark Rules of Practice and, where applicable, the Federal Rules of Civil Procedure, is expected of all parties before the Board, whether or not they are represented by counsel.

1. The Ongoing Criminal and Civil Rights Violations committed by "Dykes on Bikes" and All Dykes who participate in the annual illegal Anti Male hate riot/takeover of public lands culminating in the illegal "San Francisco Dyke March";

2. The attempt to have the USPTO act as Political Agent of the Misandry Lobby, by granting approval to their uses of the term "Dyke", so as to provide them with Government Backing for Thought & Speech Policing throughout America....

The Endorsement by the Government of a Politically Correct definition and usage of the term "Dyke", and a corresponding disfavor for all other accurate if unflattering usage, is a clear political goal of this Trademark application....

The term "Dyke" has long acknowledged the Misandry of those who choose to wear that title, and the deep obsessive hatred of Men and Male Gender traits that go with it. The attempt to use this Trademark to further the goals of Separatist/Neo Exterminationist Misandrists ... as well as Sadists and Sado-Masochistic Bondage and Flogging Fanatics such as "Dykes on Bikes" leader Vic Germany, is a shameful abuse of the trademark process.

Applicant, in lieu of answering the notice of opposition, filed a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). The motion is fully briefed.[3]

In its motion to dismiss, applicant argues that opposer has failed to plead the requisite standing to bring the present opposition as well as any discernible grounds for

---

[3] The Board has exercised its discretion to consider applicant's reply brief in support of its motion to dismiss. *See* Trademark Rule 2.127(a).

opposition.  As to the issue of standing, applicant contends that opposer has failed to identify a "real interest" in the proceeding and a "reasonable basis" for believing that he will suffer damage if the proposed mark is registered; that opposer's notice of opposition reflects only the characteristics of an "intermeddler"; that opposer's claimed injuries (e.g. that he was forced from a crosswalk during applicant's parade) have nothing to do with applicant's use of its mark; and that opposer's pleading is merely a forum for airing his political views.  With regard to opposer's failure to state a claim, applicant contends that the notice of opposition is devoid of any statutory references to the Lanham Act; and that instead, opposer improperly challenges the registration of applicant's mark on the grounds that USPTO approval constitutes an improper endorsement of applicant's political activities and that members of applicant's organization purportedly have committed various criminal acts and civil violations during the performance of applicant's parade services.

In response thereto, opposer contends that he has alleged proper claims under Section 2(a) of the Lanham Act, namely that the term DYKE is disparaging to men and is scandalous and immoral.  With regard to his standing to bring this opposition, opposer maintains that the Federal Circuit's decision in *Ritchie v. Simpson,* 170 F.3d 1092, 50

USPQ2d 1023 (Fed. Cir. 1999) (*"Ritchie"*) broadly defines a "real interest" in the context of claims brought under Section 2(a).

In reply, applicant contends that opposer has not sufficiently pleaded any claims under Section 2(a) because the notice of opposition fails to include the terms "scandalous," "vulgar," or "disparaging"; that instead, the pleading merely identifies various civic and criminal wrongs and insults purportedly committed by unidentified members of applicant's organization; and that opposer's reliance on *Ritchie* is misplaced since opposer has not pleaded that his "idiosyncratic views" are shared by others, and therefore has not alleged a reasonable belief in damage.

In order to withstand a motion to dismiss for failure to state a claim, a plaintiff need only allege such facts as would, if proved, establish that (1) the plaintiff has standing to maintain the proceeding, and (2) a valid ground exists for opposing the mark. The pleading must be examined in its entirety, construing the allegations therein liberally, as required by Fed. R. Civ. P. 8(f), to determine whether it contains any allegations, which, if proved, would entitle plaintiff to the relief sought. *See Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 213 USPQ 185 (CCPA 1982); *Kelly Services Inc. v. Greene's Temporaries Inc.,* 25 USPQ2d 1460 (TTAB 1992); and TBMP

§ 503.02 (2d ed. rev. 2004).

The purpose of the standing requirement, which is directed solely to the interest of the plaintiff, is to prevent litigation when there is no real controversy between the parties. Thus, as a threshold matter, the Board will analyze whether opposer has sufficiently pleaded his standing to bring the instant opposition. However, before launching into our discussion of standing, we will briefly review whether the notice of opposition states a proper ground for opposition.

Section 2(a) bars the registration of a mark that "consists of or comprises immoral, deceptive, or scandalous matter; or matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or national symbols, or bring them into contempt, or disrepute...." The wording of the statute makes clear that the prohibition against marks which contain immoral or scandalous matter constitutes a distinct legal claim, as opposed to the prohibition against marks which disparage or bring into contempt or disrepute persons, institutions or beliefs, or which falsely suggest a connection.

A claim under Section 2(a) against the registration of scandalous or immoral matter pertains only to *marks* that are scandalous or immoral. The authority of the Act does not extend to goods or services that may be viewed as scandalous

or immoral in nature.  *See In re Madsen*, 180 USPQ 334, 335 (TTAB 1973) (WEEK-END SEX for magazines held not scandalous, the Board observing that whether the magazine contents may be pornographic was not an issue before the Board); *In re McGinley*, 660 F.2d 481, 485, 211 USPQ 668, 673 (CCPA 1981) ("[T]he Lanham Act does not require, under the rubric of 'scandalous,' any inquiry into the specific goods or services not shown in the application itself.").

With regard to a claim of disparagement under Section 2(a), whether a mark is found to be disparaging depends on the context and the persons or groups of persons the mark is directed toward.  *See Boswell v. Mavety Media Group Ltd.*, 52 USPQ2d 1600 (TTAB 1999) (BLACK TAIL used on adult entertainment magazines, found not to be disparaging of women in general, or African-American women in particular, nor to bring those groups into contempt or disrepute); *Order Sons of Italy in America v. Memphis Mafia Inc.*, 52 USPQ2d 1364 (TTAB 1999) (THE MEMPHIS MAFIA for entertainment services found not to be matter that disparages Italian-Americans or brings them into contempt or disrepute).

It is apparent from opposer's responsive brief that he intends to assert in his pleading both that applicant's mark is disparaging and that it is comprised of scandalous and immoral material under Section 2(a).  However, based on a

review of opposer's notice of opposition, the Board cannot discern any properly pleaded claim.

Nonetheless, insofar as opposer has sought to challenge applicant's mark under Section 2(a), the Board will analyze the issue of standing within the context of that statutory provision.  For this reason, a discussion of standing as interpreted by the Federal Circuit in *Ritchie,* the seminal case on standing with regard to Section 2(a) claims of this nature, is instructive.

In the case of a notice of opposition, the standing requirement has its basis in Section 13 of the Trademark Act which provides in relevant part that "[a]ny person who believes that he would be damaged by the registration of a mark upon the principal register,  . . .may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor...."  An opposer must also satisfy  two judicially-created requirements in order to have standing: the opposer (1) must have a "real interest" in the proceedings, and (2) must have a "reasonable" basis for his belief of damage.  *See e.g., Ritchie,* 50 USPQ2d at 1025.

In *Ritchie*, the opposer challenged the registration by Orenthal James Simpson of the marks O.J. SIMPSON, O.J., and THE JUICE for a broad range of goods on the basis that the marks comprised immoral or scandalous matter and should be

denied registration under Section 2(a).[4]  The Federal Circuit, in reversing the Board, found that the opposer in that case had met the judicial requirements of pleading a "real interest" in the proceedings and a "reasonable" basis for his belief in damage.

As to the "real interest" requirement, the court interpreted this prong as meaning that the opposer must plead "a direct and personal stake in the outcome of the opposition."  *Ritchie,* 50 USPQ2d at 1026.  In reaching that conclusion, the court stated the following:

> In no case has this court ever held that one must have a specific commercial interest, not shared by the general public, in order to have standing as an opposer.  Nor have we ever held that being a member of a group with many members is itself disqualifying.  The crux of the matter is not how many others share one's belief that one will be damaged by the registration, but whether that belief is reasonable and reflects a real interest in the issue.

*Id.* at 1027.  The court, in applying this standard, found that opposer sufficiently pleaded a real interest in the case by alleging "that he would be damaged by the registration of the marks because the marks disparage his values, especially those values relating to his family;" that opposer was "a family man" who believes that the "sanctity of marriage requires a husband and wife who love and nurture one another"; that opposer was a member of a

---

[4] Opposer also challenged registration on a second ground that one of the marks is primarily merely a surname.

group that could be potentially damaged by marks that allegedly are synonymous with "wife-beater and wife-murderer" and that the marks are scandalous because they would "attempt to justify physical violence against women." *Id.*

With regard to the second prong, the court interpreted the "belief of damage" language in Section 13 as meaning that the belief must be more than a subjective belief, and held that the reasonableness of the belief could be demonstrated in various manners. The first method for an opposer to plead the requisite level of "reasonableness" is to allege that he possesses a trait or characteristic that is "clearly and directly implicated by the proposed trademark." *Id.* at 1028. In other words, marks that contain terms that are allegedly offensive to a particular group may be challenged by members of that group. The court provided the example that Native Americans, by virtue of their racial identity, inherently possess a trait directly implicated by the mark REDSKINS.

A second method for alleging the reasonableness of an opposer's belief of damage is to allege that others share the same belief of harm from the proposed trademark, and that the opposer is not alone in his belief of damage. The allegation of "objective evidence" could take place in various forms, including "surveys," "petitions," or

"affidavits from public interest groups representing people who allegedly share the damage caused by the mark."  *Id.* The court then drew the following conclusions:

> In the case at hand, Mr. Ritchie alleges that the marks possess a connotation such that the marks are offensive to him as a Christian, family man. With regard to evidence of a trait or characteristic that is clearly and directly implicated by the marks at issue, we do not see that as the same kind of immutable trait or characteristic similar to that of women or Native Americans.  Therefore, in order to show reasonableness of his belief of damage, Mr. Ritchie must allege other facts establishing that his belief is other than subjective.
>
> In his notice of opposition, at paragraph eight, Mr. Ritchie alleges that he has obtained petitions signed by people from all over the United States who agree with him that the marks at issue are scandalous, denigrate their values, encourage spousal abuse and minimize the problem of domestic violence.  Again, for purposes of the motion to dismiss on the pleadings for lack of standing, we accept as true all well-pled allegations.  Those allegations are more than sufficient to establish that he has objective proof that he is not alone in believing that he would be damaged if the marks were registered.  Therefore, Mr. Ritchie's belief of damage, for purposes of the motion, has a reasonable basis in fact.

*Id.*

Applying the principles established in *Ritchie* to this case, the Board finds that while opposer has sufficiently pleaded a "real interest" in the proceedings, opposer has failed to satisfy the second requirement for standing, that is, he has not alleged facts which, if proven, would show he has a "reasonable" basis for his belief of damage.

Opposer has failed to allege that he possesses a trait or characteristic that is inherently implicated by applicant's applied-for mark -- that is, that he is a "lesbian" or "dyke."  Rather, as opposer alleges in the beginning of his notice of opposition, "I am a Male Citizen of the United States and a fourth-generation native son of the City of San Francisco."  Applicant's mark is therefore only subjectively offensive to opposer.  Thus, similar to the plaintiff involved in *Ritchie*, the opposer in this case must resort to the second method for demonstrating the reasonableness of his belief of damage.

In this regard, opposer has failed to make a sufficient pleading.  A review of the notice of opposition shows that opposer has failed to allege any facts that others (i.e. men) share his belief of damage.  All we can find in the pleading is that opposer himself is personally offended by the "illegal behavior" and "illegal acts" purportedly committed by participants in applicant's parade services and that he objects to the USPTO's supposed endorsement of applicant's activities in approving applicant's mark for publication.  Opposer has not made any objective allegations regarding the reasonableness of his belief of damage, such as by alleging that he has obtained affidavits or signatures on petitions, or conducted surveys that show, as required by *Ritchie*, that other men share his belief in damage if

applicant's mark were to register.  Opposer has throughout the notice of opposition referenced various excerpts from publications (i.e. articles, books, statements issued by applicant).  However, none of the excerpts provides objective evidence that others who are members of opposer's group (that is, men) would perceive applicant's mark as disparaging or offensive to men.

In addition, opposer's allegations regarding applicant's conduct vis-à-vis men (e.g., allegations that applicant bans men from public streets and parks during the duration of applicant's parade and that "large numbers of 'Dykes on Bikes' [use] THEIR MOTORCYCLES AS OFFENSIVE WEAPONS AGAINST MEN") do not constitute an objective pleading that other men concur with opposer's belief in damage.  As to the litany of criminal or civil wrongdoings participants in applicant's parades purportedly have committed, the Board is not the proper venue for bringing such objections -- the Board's jurisdiction is limited to determining whether trademark registrations should issue or whether registrations should be maintained; it does not have authority to determine whether a party has engaged in criminal or civil wrongdoings.

Lastly, with regard to opposer's allegations that the USPTO, in approving applicant's mark for publication, has given its stamp of governmental imprimatur, it is well

settled that registration of a trademark reflects no endorsement by the USPTO of the applicant's products or services.  *See In re Old Glory Condom Corp.,* 26 USPQ 1216 (TTAB 1993).

In sum, we find that opposer, by his allegations, cannot be considered more than a mere intermeddler in this case.[5]

On this basis, we find that opposer lacks the requisite standing to bring the instant opposition proceeding. Accordingly, applicant's motion to dismiss is granted, and the opposition proceeding herein is dismissed.

---

[5]  Further, as noted above, opposer has failed to properly plead a claim under Section 2(a) of the Trademark Act.